## IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF ARKANSAS
## CENTRAL DIVISION

**CEDRIC JOHNSON**                                                                      **PLAINTIFF**
**ADC #099607**

**v.**                              **No: 4:23-cv-00642-KGB-PSH**

**COREY WILFONG,** *et al.*                                                      **DEFENDANTS**

## PROPOSED FINDINGS AND RECOMMENDATION

## INSTRUCTIONS

The following Recommendation has been sent to Chief United States District Judge Kristine G. Baker. You may file written objections to all or part of this Recommendation. If you do so, those objections must: (1) specifically explain the factual and/or legal basis for your objection, and (2) be received by the Clerk of this Court within fourteen (14) days of this Recommendation. By not objecting, you may waive the right to appeal questions of fact.

## DISPOSITION

### I. Introduction

Plaintiff Cedric Johnson filed a *pro se* complaint pursuant to 42 U.S.C. § 1983 on July 12, 2023 (Doc. No. 2) and an amended complaint on September 13, 2023

(Doc. No. 6), while detained at the Dub Brassell Detention Center.[1]  Johnson sues police detective Corey Wilfong and police officers Rick Bunting and Nate Smith (collectively the "Defendants") in both their official and individual capacities.  Doc. No. 6 at 2.  He alleges that defendants Bunting and Smith used excessive force against him while defendant Wilfong failed to intervene on January 24, 2022.  Doc. No. 6 at 4-6.  He also alleges the Defendants denied him access to appropriate medical treatment after he was injured.  *Id.*  Johnson also sues Defendants under Arkansas law for the torts of intentional infliction of emotional distress, battery, and assault.  *Id.* at 5 & 7.

Before the Court is a motion for summary judgment, brief in support, and statement of undisputed facts filed by the Defendants (Doc. Nos. 31-33).  Johnson was notified of his opportunity to file a response to the motion for summary judgment and a separate statement of disputed facts (Doc. No. 38).  He filed a declaration which included a statement of facts (Doc. No. 39), and the Defendants filed a reply (Doc. No. 40).  The Defendants' statement of facts, and the other pleadings and exhibits in the record, establish that the material facts are not in dispute, and they are entitled to judgment as a matter of law.

---

[1] Johnson is currently incarcerated in the Arkansas Division of Correction's North Central Unit.  *See* Doc. No. 29.

## II. Legal Standard

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is proper if "the movant shows that there is no genuine dispute as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(a); *Celotex v. Catrett*, 477 U.S. 317, 321 (1986). When ruling on a motion for summary judgment, the court must view the evidence in a light most favorable to the nonmoving party.[2] *Naucke v. City of Park Hills*, 284 F.3d 923, 927 (8th Cir. 2002). The nonmoving party may not rely on allegations or denials, but instead must demonstrate the existence of specific facts that create a genuine issue for trial. *Mann v. Yarnell*, 497 F.3d 822, 825 (8th Cir. 2007). The nonmoving party's allegations must be supported by sufficient probative evidence that would permit a finding in his favor on more than mere speculation, conjecture, or fantasy. *Id.* (citations omitted).

An assertion that a fact cannot be disputed or is genuinely disputed must be supported by materials in the record such as "depositions, documents, electronically

---

[2] In *Reed v. City of St. Charles, Mo.*, 561 F.3d 788 (8th Cir. 2009), the Eighth Circuit Court of Appeals discussed the requirement that facts be viewed in the light most favorable to the nonmoving party when considering a motion for summary judgment. The Court stated, "[i]f 'opposing parties tell two different stories,' the court must review the record, determine which facts are material and genuinely disputed, and then view those facts in a light most favorable to the non-moving party—as long as those facts are not so 'blatantly contradicted by the record . . . that no reasonable jury could believe' them." *Id.* at 790 (*quoting Scott v. Harris*, 550 U.S. 372, 380 (2007)).

stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials . . .". FED. R. CIV. P. 56(c)(1)(A). A party may also show that a fact is disputed or undisputed by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(B). A dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party; a fact is material if its resolution affects the outcome of the case. *Othman v. City of Country Club Hills*, 671 F.3d 672, 675 (8th Cir. 2012). Disputes that are not genuine or that are about facts that are not material will not preclude summary judgment. *Sitzes v. City of West Memphis, Ark.*, 606 F.3d 461, 465 (8th Cir. 2010).

### III. Facts

The facts listed below are taken from those submitted by the Defendants that are supported by documents attached to their statement of facts which include:  the Deposition Testimony of Cedric Johnson ("*Johnson's Deposition*") (Doc. No. 32-1); Johnson's January 24, 2022 Arrest Records ("*Arrest Records*") (Doc. No. 32-2); Bodycam Footage of Johnson's Arrest ("*Arrest Video*") (Doc. No. 32-3); Johnson's Post Arrest Interview Audio Footage ("*Arrest Interview*") (Doc. No. 32-4); Johnson's April 21, 2022 Medical Records ("*Medical Record*") (Doc. No. 32-5); Johnson's Criminal Information ("*Criminal Information*") (Doc. No. 32-6); and

Johnson's Sentencing Order ("*Sentencing Order*") (Doc. No. 32-7).  Disputed facts are noted.  Opinions, argument, legal conclusions, and immaterial facts are omitted.

1.    Johnson began experiencing chronic back problems as early as 2009 while he was incarcerated with the Arkansas Department of Corrections ("ADC"). *Johnson's Deposition* at 15-16.

2.    Johnson's back problems were further aggravated after he was thrown over a balcony following an altercation in April of 2015.  *Johnson's Deposition* at 16-17.

3.    The back problems culminated in a surgery known as lumbar discectomy and fusion at L4-5 on May 18, 2017.  *Johnson's Deposition* at 16-17.

4.    On January 24, 2022, Defendants Smith and Bunting were dispatched to 1830 South Oak Street in Pine Bluff, Arkansas in reference to a disturbance between brothers. This was the second time law enforcement was called to this address that day.  The first was based on reports that a male was battering his mother. The victim/mother was Dianna Johnson and the son allegedly battering her was Johnson. The first dispatch resulted in the issuance of a warrant against Johnson for domestic battery. Defendant Wilfong, who responded to the first call, informed Smith and Bunting that Johnson was wanted related to the previous call.  *Arrest Record* at 2.

5.    At approximately 10:25 p.m., on January 24, 2022, Smith and Bunting

arrived at 1830 South Oak Street. *Arrest Video* at 1:05 - 1:11.

6.     Upon exiting his police cruiser, Smith approached a group of men that included Johnson. *Arrest Video* at 1:11 - 1:18.

7.     As Smith approached, he addressed the group of men and asked how they were doing. *Arrest Video* at 1:24 - 1:26.

8.     A male voice then asked Smith what his motives were, to which Smith replied that somebody called him "over here." *Arrest Video* at 1:27 - 1:29.

9.     A male voice stated that nobody called the police. *Arrest Video* at 1:31.

10.     Johnson approached Smith and responded that he was the one who had called the police. *Arrest Video* at 1:33 - 1:34.

11.     Smith requested Johnson's name, and Johnson got closer to Smith and stated that his name was Cedric Johnson, and he was there to retrieve his clothes from his mother's house. *Arrest Video* at 1:34 - 1:36.

12.     Smith placed his hand on Johnson's chest and requested that Johnson "back up a little bit." *Arrest Video* at 1:37.

13.     Johnson backed up and told Smith to not place his hands on him, and Smith told Johnson not to "walk up" on him. *Arrest Video* at 1:38 - 1:39.

14.     Smith asked Johnson for his name again, and Johnson replied that his name was Cedric Johnson. *Arrest Video* at 1:41 - 1:44.

15.     Smith then instructed Johnson to turn around and place his hands

behind his back.  Johnson responded by turning around and walking away from Smith.  *Arrest Video* at 1:45 - 1:48.

16.     Smith told Johnson to turn around, to stop running away from him, and attempted to grab Johnson by the arm.  *Arrest Video* at 1:48 - 1:50.

17.     Johnson then threw his arms out and jerked away, and Smith told Johnson not to touch him.  *Arrest Video* at 1:50 - 1:51.

18.     Smith then pushed Johnson in the chest and instructed him to turn around; Johnson refused and moved closer to Smith; Smith pushed Johnson in the chest and again ordered Johnson to turn around, and Johnson again refused.  *Arrest Video* at 1:51 - 1:55.

19.     Smith placed his hand on Johnson's shoulder and again ordered Johnson to turn around, and Johnson refused once more.  *Arrest Video* at 1:55 - 1:56.

20.     At this point, Bunting ran up to Johnson from behind him and wrapped his arms around his chest.  *Arrest Video* at 1:57.  What happened next is not clearly shown on the video, but Bunting ended up on the ground.  *Id.* at 1:58 - 2:02.  Johnson explained that Bunting flipped over after attempting to jump on his back.  *Johnson's Deposition* at 26-27, 32.

21.     Smith then placed his hand on the back of Johnson's neck before he attempted to restrain Johnson.  *Arrest Video* at 2:02 - 2:11.

22.     After calling for back-up, Smith pushed Johnson to the ground, and

both Bunting and Smith restrained and handcuffed Johnson.[3]  *Arrest Video* at 2:12 -

2:30.  They can be heard arguing, but Johnson did not complain about hurting his

back or ask to be taken to the hospital.  *Id.* at 2:28 – 3:01.

23.    In his deposition, Johnson stated that Smith tackled him to the ground

and "threw his knee" into his back.  *Johnson's Deposition* at 27, 34.  He also claimed

that Smith hit him while he was on the ground, and that he asked to be taken to the

hospital.  *Id.* at 34.  In his response to the Defendants' motion for summary judgment,

Johnson claims that Bunting hit him twice in the head while he was on the ground.

Doc. No. 39 at 5.  The bodycam footage does not show either Smith or Bunting

hitting Johnson.  *Arrest Video* at 2:12 - 2:30. It also does not support Johnson's

statement that he asked to be taken to the hospital.

24.    After Johnson was handcuffed, Smith escorted him to Smith's police

cruiser.  Johnson did not appear to be injured and had no trouble walking.  He did

not claim to be injured or state a need for medical assistance at that time.  *Arrest

Video* at 2:55 - 3:19.

25.    Johnson was transported directly from 1830 South Oak Street to W.C.

"Dub" Brassell Detention Center ("Dub Brassell"), by Smith.  *Johnson's Deposition*

---

[3] According to the arrest record, Bunting lost consciousness and broke his hand and nose during the incident, and Smith suffered a sprained muscle in his shoulder.  *Arrest Record* at 5, 8.  If Bunting lost consciousness after being flipped over, it did not last long because he restrained Plaintiff a few moments later.  *Arrest Video* at 2:02 - 2:17.

at 33.  In his response to the Defendants' motion for summary judgment, Johnson claimed he told Smith he needed to go to the hospital during the car ride, and Smith told him no, he was going to jail.  Doc. No. 39 at 2.  Audio of an argument between Johnson and Smith can be heard on the bodycam footage, but there is no mention of going to the hospital; rather, Johnson argued with Smith about the reason for his arrest.  *Arrest Video* at 3:20-5:44.

26.    Following arrival at Dub Brassell, Smith and Bunting were transported to Jefferson Regional Medical Center for treatment.  *Arrest Record* at 5.

27.    After being taken to Dub Brassell, Johnson never saw Smith or Bunting again.  *Johnson's Deposition* at 36.

28.    Johnson was booked at Dub Brassell following his arrest and was interviewed by Defendant Detective Corey Wilfong.  *Arrest Record* at 4-6.

29.    Johnson does not know where Wilfong was during his arrest by Smith and Bunting.  *Johnson's Deposition* at 32-33.

30.    Johnson's only interaction with Wilfong was during the interview following his booking at Dub Brassell.  *Johnson's Deposition* at 35-36.  Following his interview, Johnson never saw Wilfong again.  *Id.* at 36.

31.    During his interview with Wilfong, Johnson stated that he had a scheduled back surgery soon, and the officers may have aggravated his condition. He did not ask Wilfong to request medical care for him. *Arrest Interview* at 6:25 -

7:50.

32.    According to Johnson, he asked for medical treatment after arriving at Dub Brassell, but was denied. *Johnson's Deposition* at 34.  He stated that Dub Brassell is operated by Captain Adams of the Jefferson County Sheriff's Office, and he asked Adams to the take him to the hospital. *Id.* at 37.

33.    Johnson remained at Dub Brassell for 45 days until he was able to "bond out" on March 11, 2022. *Johnson's Deposition* at 37-40.  Johnson claims that while detained, he slipped and fell and sprained his back. *Id.* at 40-41.

34.    Johnson claimed he saw a doctor the morning after he bonded out of Dub Brassell, complaining that he hurt his back when he slipped and fell on a wet floor while detained there. *Johnson's Deposition* at 40-41; *Medical Record* at 5.

35.    Medical records indicate that Johnson received an X-ray from Conway Regional Health System ("CRHS") on April 21, 2022, and he was diagnosed with degenerative disc disease. *Medical Record* at 6.

36.    On June 16, 2022, Johnson underwent a procedure called transpedicular kyphoplasty at the L3 level. *Johnson's Deposition* at 43.

37.    Johnson was ultimately charged via criminal information with domestic battery in the second degree for the battery on his mother, in violation of Ark. Code Ann. § 5-26-304; and battery in the second degree for the battery on Bunting, in violation of Ark. Code Ann. § 5-13-202. *Criminal Information* at 1; *Sentencing*

*Order.*

38.     Johnson entered a negotiated plea of nolo contendere for the charge of domestic battery in the second degree and was sentenced to 60 months in the ADC. *Sentencing Order* at 1.

39.     Johnson entered a negotiated plea of nolo contendere for the charge of battery in the second degree and was sentenced to 60 months in the ADC. *Sentencing Order* at 2.

## IV. Analysis

### A.     *Official Capacity Claims*

The Defendants argue that Johnson fails to state an official capacity claim. Official capacity claims are "functionally equivalent to a suit against the employing governmental entity." *Veach v. Bartels Lutheran Home*, 627 F.3d 1254, 1257 (8th Cir. 2010).  Thus, a suit against the Defendants in their official capacities is in essence a suit against the city of Pine Bluff.  *See Murray v. Lene*, 595 F.3d 868 (8th Cir. 2010); *Liebe v. Norton*, 157 F.3d 574 (8th Cir. 1998).  A municipality cannot be held liable on the basis of *respondeat superior*, or simply by virtue of being the employer of a tortfeasor.  *Atkinson v. City of Mountain View, Mo.*, 709 F.3d 1201 (8th Cir. 2013).  Accordingly, as city employees, the Defendants can be held liable in their official capacities in this case only if Johnson can establish that a constitutional violation was committed pursuant to "(1) an 'official municipal

policy,' . . . (2) an unofficial 'custom,' . . . ; or (3) a deliberately indifferent failure to train or supervise . . . ." *Corwin v. City of Indep., MO.*, 829 F.3d 695, 699–700 (8th Cir. 2016) (internal citations omitted).

In his complaint, Johnson does not assert that a custom or policy of the city of Pine Bluff was the moving force behind the claimed violations of his constitutional rights. Doc. No. 6. Accordingly, the Defendants are entitled to summary judgment on Johnson's official capacity claims.

### B.    *Qualified Immunity – Individual Capacity Claims*

The Defendants argue they are entitled to qualified immunity with respect to Johnson's individual capacity claims. Qualified immunity protects government officials from liability for damages "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person [in their positions] would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982). Qualified immunity is a question of law and is appropriately resolved on summary judgment. *McClendon v. Story County Sheriff's Office*, 403 F.3d 510, 515 (8th Cir. 2005); *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985). To determine whether a defendant is entitled to qualified immunity, the Court must consider two questions: (1) do the facts alleged by plaintiff establish a violation of a constitutional or statutory right; and (2) if so, was that right clearly established at the time of the defendant's alleged misconduct. *Wright v. United States*, 813 F.3d 689, 695 (8th

Cir. 2015).  Courts may exercise "their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances of the particular case at hand."  *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

    1.  <u>Excessive Force/Failure to Intervene</u>.

Johnson claims that defendants Bunting and Smith used excessive force against him while defendant Wilfong failed to intervene during his arrest on January 24, 2022.  Doc. No. 6 at 4-6.  Johnson acknowledges in his deposition that Wilfong was not present during his arrest, and that he first encountered Wilfong during an interview at Dub Brassell.  *Johnson's Deposition* at 32-33.  Therefore, Wilfong was not involved in any use of force and is entitled to judgment as a matter of law.  *See Mayorga v. Missouri,* 442 F.3d 1128, 1132 (8th Cir. 2006) ("Liability under section 1983 requires a causal link to, and direct responsibility for, the deprivation of rights.") (internal quotations and citations omitted).

Regarding Bunting and Smith's use of force, Johnson alleged in his amended complaint that they broke his back.  Doc. No. 6 at 4-5.  In his deposition, he testified that Bunting tried to jump on his back, and then Smith tackled him to the ground and threw his knee in Johnson's back.  *Johnson's Deposition* at 33-34.  He further claimed that Smith hit him once in his back and that Bunting hit him twice in the head.  *Id.*; Doc. No. 39 at 5.  In his response to the Defendant's motion for summary

judgment, Johnson asserts that this incident resulted in a fracture in his vertebrae, and that his medical records prove this.  Doc. No. 39 at 1 & 5.

The Fourth Amendment's objective reasonableness standard governs a claim that an officer used excessive force "in the course of making an arrest, investigatory stop, or other 'seizure.'" *Graham v. Connor*, 490 U.S. 386, 388 (1989).  A court's analysis "requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake," as well as "careful attention to the facts and circumstances of each particular case." *Graham*, 490 U.S. at 396 (quotations omitted); *see County of Los Angeles v. Mendez*, 581 U.S. 420, 427-28 (2017). "'Reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396 (citations omitted).  A court may consider factors such as: "the severity of the crime; whether the suspect poses a threat of harm to others; whether the suspect is resisting arrest; and other factors, such as whether the situation is 'tense, uncertain, and rapidly evolving,' which would force an officer to make 'split-second judgments' about how much force is necessary." *Coker v. Arkansas State Police*, 734 F.3d 838, 842–43 (8th Cir. 2013) (quoting *McKenney v. Harrison*, 635 F.3d 354, 360 (8th Cir. 2011)).

Applying the objective reasonableness standard to this case, the Court finds

that neither Smith nor Bunting used excessive force during Johnson's arrest on January 24, 2022. As described above, Johnson tells a different story about these events than the story told by Smith and Bunting. And if opposing parties describe two different stories, as is the case here, the Court is required to view genuinely disputed material facts in a light most favorable to the nonmoving party, as long as those facts are not so blatantly contradicted by the record that no reasonable jury could believe them. In this case, the bodycam footage blatantly contradicts Johnson's story about the events leading to his arrest. It shows that Johnson argued with Smith and walked away when he was told to turn around and place his hands behind his back. It shows Smith attempting to place Johnson's hands behind his back and Johnson jerking his arm away from Smith and walking away from Smith. Johnson continued to refuse to submit to arrest as instructed to by Smith, and Johnson argued with Smith as Bunting grabbed him from behind. While the bodycam footage does not show Bunting being thrown or flipped over by Johnson, Johnson acknowledges that this happened. The video also contradicts Johnson's story that Smith and Bunting hit Johnson after he was taken to the ground, as he alleged in his deposition and response to their motion for summary judgment.

When Smith and Bunting arrived at the scene, they were aware that an arrest warrant had been issued for Johnson for battering his mother and that Johnson therefore posed a potential threat of harm. And in fact, Johnson did pose a threat of

harm as evidenced by his refusal to submit to arrest, his jerking his arm away from Smith and walking away, and then by throwing Bunting to the ground when Bunting tried to restrain Johnson, causing him injury. A viewing of the video establishes that the situation was 'tense, uncertain, and rapidly evolving,' and would force an officer to make 'split-second judgments' about how much force is necessary. Under these circumstances, it was not unreasonable for Bunting to attempt to restrain Johnson or for Smith to subdue Johnson by tackling him to the ground.

The Court also notes that the bodycam footage blatantly contradicts Johnson's claim that he told the defendants that he had suffered an injury warranting immediate medical treatment, and that he repeatedly asked to go to the hospital but was denied. Instead, the video shows that he walked to the police car without difficulty and continued to argue with Smith about why he was arrested during the drive to Dub Brassell. He does not complain about an injury or ask for medical treatment. Additionally, his medical records after his release from Dub Brassell do not support his claim that Smith and Bunting broke his back when they arrested him. Those medical records document Johnson sought treatment for back injuries which he claimed resulted from a recent slip and fall at Dub Brassell, not from excessive force at the time of his arrest.

Finally, Johnson has not provided any relevant case law indicating that a reasonable officer in White or Bunting's position would know that their conduct

violated clearly established law at the time of the incident.  *See Monroe v. Ark. State Univ.*, 495 F.3d 591, 594 (8th Cir. 2007) ("Although the defendant bears the burden of proof for this affirmative defense [of qualified immunity], the plaintiff must demonstrate that the law was clearly established.").  On the contrary, clearly established law holds that officers can use force in circumstances where an individual is refusing to comply with reasonable orders.  *See e.g., Ehlers v. City of Rapid City*, 846 F.3d 1002, 1011 (8th Cir. 2017) (holding no constitutional violation in using a spin take-down or taser where an arrestee was "continuing to lay on his hands and refusing to comply with instructions" because officers "could have interpreted" this "as resistance," "regardless of whether [the man] actually intended to resist"); *Smith v. City of Minneapolis*, 754 F.3d 541, 547 (8th Cir. 2014) (finding no law clearly establishing that hitting and kicking a domestic abuse suspect who refused to comply with officer's orders to "get down on the ground" and be handcuffed); *Wertish v. Krueger,* 433 F.3d 1062, 1066 (8th Cir. 2006) (finding it reasonable for an officer to pull suspect, who had failed to follow multiple orders, out of a vehicle and take him down to the ground to handcuff him).  For these reasons, defendants Bunting and Smith should therefore be granted qualified immunity as to Johnson's excessive force claims and their motion for summary judgment should be granted.

2.    <u>Medical Treatment</u>

Johnson also alleges that Smith, Bunting, and Wilfong were deliberately indifferent to his serious medical needs by not taking him to the hospital to get treatment for his alleged back injury.  The evidence does not support Johnson's allegations or illustrate that any defendant violated his constitutional rights by not taking him to the hospital.

Pretrial detainees' claims are evaluated under the Fourteenth Amendment's Due Process Clause rather than the Eighth Amendment.  *See Hartsfield v. Colburn*, 371 F.3d 454, 457 (8th Cir. 2004).  Pretrial detainees are entitled to at least as much protection under the Fourteenth Amendment as under the Eighth Amendment.  *See id.* (citing *Spencer v. Knapheide Truck Equip. Co.,* 183 F.3d 902, 906 (8th Cir. 1999)); *see also Davis v. Hall,* 992 F.2d 151, 152–53 (8th Cir. 1993) (per curiam) (applying deliberate indifference standard to pretrial detainee's claims of inadequate medical care).[4]  To succeed with an Eighth Amendment inadequate medical care

---

[4] In *Spencer,* the Eighth Circuit explained that it had never articulated an exact standard for evaluating medical treatment claims brought by pretrial detainees.  183 F.3d at 905.  The Court acknowledged that pretrial detainees' claims may be subject to an objective reasonable test rather than the subjective deliberate indifference standard.  *Id.* The Eighth Circuit addressed this issue again in *Bailey v. Feltmann*, 810 F.3d 589, 593 (8th Cir. 2016), where it declined to address the proper constitutional standard unnecessarily, but noted that when that case was decided it was not clearly established that a pre-trial detainee was entitled to more protection than that provided by the Eighth Amendment.

claim, a plaintiff must allege and prove that: (1) he had objectively serious medical needs; and (2) prison officials subjectively knew of, but deliberately disregarded, those serious medical needs. *Dulany v. Carnahan*, 132 F.3d 1234, 1239 (8th Cir. 1997). For a medical need to be objectively serious, it must be diagnosed by a medical provider as requiring treatment, or the need must be so obvious that a layperson would easily recognize the need for medical treatment. *See Barton v. Taber*, 820 F.3d 958, 964 (8th Cir. 2016). *See also Williams v. Whitfield*, No. 2:09CV00100 JLH/BD, 2010 WL 4792146, at *2 (E.D. Ark. Nov. 17, 2010) (quoting *Roberson v. Bradshaw,* 198 F.3d 645, 648 (8th Cir.1999) ("'[W]e have repeatedly emphasized that the need or the deprivation alleged must be *either obvious to the lay person* or supported by medical evidence, like a physician's diagnosis.'") (emphasis in original). Additionally, the Eighth Circuit has held that a "prisoner must show more than negligence, more even than gross negligence, and mere disagreement with treatment decisions does not rise to the level of a constitutional violation." *Estate of Rosenberg by Rosenberg v. Crandell*, 56 F.3d 35, 37 (8th Cir. 1995).

Johnson's actions after his arrest did not exhibit that he had objectively serious medical needs that would be obvious to the layperson. He walked without difficulty. He did not claim an injury immediately after Bunting attempted to restrain him or after Smith successfully took him to the ground. He argued with Smith during the

drive to the police station about the reason for his arrest, and did not claim to be injured or need medical attention. And he walked from the police car to the station upon arrival there without complaint. His interactions with Smith and Bunting simply do not evidence facts from which a reasonable person would believe he had serious medical needs. Nor can they be a basis for a finding that Smith or Bunting subjectively knew of but deliberately disregarded any serious medical needs.

Additionally, Johnson's interaction with Wilfong does not support a finding that he had objectively serious medical needs. The interview lasted a little over seven minutes. The bulk of the interview consists of Wilfong reading Johnson his Miranda rights and Johnson describing what took place during the alleged altercation with his mother and complaining about the altercation with Smith and Bunting. He briefly references his back one time but does not appear to ask for medical assistance. The whole of the interview with Johnson simply does not support a finding that a reasonable person would believe Johnson exhibited serious medical needs at that time or that any such need would have been obvious to a layperson. The interview likewise fails to support a finding that Wilfong subjectively knew of but deliberately disregarded any serious medical needs Johnson had at the time.

In addition, Johnson has not produced any medical records or expert opinion testimony to establish that he had serious medical needs warranting immediate medical treatment. Instead, the evidence of record establishes that Johnson sought

treatment for a back injury after he was released from Dub Brassell, and reported to the medical provider that the injury resulted from a recent slip and fall at that facility, not from any injury resulting from his arrest. For these reasons, the Defendants are entitled to qualified immunity and should be awarded summary judgment on Johnson's medical treatment claims.

### C.    State Law Claims

Because Johnson's constitutional claims are subject to dismissal, the Court should decline to exercise jurisdiction over Johnson's state law claims for intentional infliction of emotional distress and assault/battery. *See Gibson v. Weber*, 433 F.3d 642, 647 (8th Cir. 2006) (Congress unambiguously gave district courts discretion in 28 U.S.C. § 1367(c) to dismiss supplemental state law claims when all federal claims have been dismissed).

## IV.  Conclusion

For the reasons described herein, the undersigned recommends that the Defendants' motion for summary judgment (Doc. No. 31) be granted.  Johnson fails to state official capacity claims, and the Defendants are entitled to qualified immunity on Johnson's individual capacity Fourth Amendment claims. Johnson's Fourth Amendment claims should be dismissed with prejudice.  The Court should decline to exercise supplemental jurisdiction as to Johnson's state law claims, and those claims should be dismissed without prejudice.

DATED this 19th day of August, 2025.

_____
UNITED STATES MAGISTRATE JUDGE